Roberto Andres **MEJIA–RUIZ**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 1250, Docket 94–4163.

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1995.

Decided April 4, 1995.

Michael P. DiRaimondo, New York City (Marialaina L. Masi, of counsel), for petitioner.

Diogenes P. Kekatos, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for S. Dist. of New York, James A. O'Brien III, Sp. Asst. U.S. Atty., Steven I. Froot, Asst. U.S. Atty., of counsel), for respondent.

Before: OAKES, KEARSE, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Roberto Andres Mejia–Ruiz ("Mejia") petitions for review of an August 26, 1994, decision of the Board of Immigration Appeals ("BIA") treating a deportation order issued by an immigration judge as final because of Mejia's departure from the United States following the issuance of that order. The basic question presented is whether § 3.4 of Title 8 of the Code of Federal Regulations is invalid because it was not promulgated with the "notice and comment" procedures required for certain rules by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b). The petitioner also raises questions about the propriety of the conduct of the Immigration and Naturalization Service ("INS") and its counsel, and the bearing of that conduct upon the legality of the INS's return of the petitioner to the Dominican Republic.

The facts and issues of the case, in brief, are as follows. An immigration judge issued a deportation order against Mejia on March 22, 1993, and the petitioner appealed the judge's decision to the BIA. During the pendency of the appeal Mejia voluntarily left the country. Under 8 C.F.R. § 3.4 (1994), an alien's departure while an appeal to the BIA is pending constitutes a withdrawal of his appeal. The BIA decided that, pursuant to § 3.4, the immigration judge's decision became final because of Mejia's departure. Before this court, the petitioner contends that § 3.4 is invalid because the INS originally promulgated that provision in 1964 without the "notice and comment" procedures that

the petitioner claims were required by the APA.

In challenging his deportation, the petitioner also takes issue with INS actions that culminated in the agency's return of Mejia to the Dominican Republic on January 23, 1995. As described in further detail below, the INS in May 1994 initiated separate "exclusion proceedings" related to the deportation case now before us.[1] After a final adverse decision in the exclusion proceedings was issued on January 11, 1995, the petitioner sought a "stay of deportation" in this court. The stay was granted by a judge of this court, but the judge, unwittingly, did not sign the order until two hours after the INS had put the petitioner on a plane to the Dominican Republic. The petitioner contends that the INS arranged for his departure in contravention of law, and that his "illegal deportation" should not deprive this court of jurisdiction to review the BIA's August 1994 deportation decision.

We agree with the petitioner that the conduct of the INS and its counsel in this case is disturbing. Because we find that § 3.4 is valid, however, we conclude that we lack jurisdiction based on the petitioner's voluntary departure from this country in 1994 during the pendency of his BIA appeal, and we dismiss the petition on that basis.

## BACKGROUND

Mejia is a citizen of the Dominican Republic who was admitted to the United States as a lawful permanent resident in 1971. On May 23, 1991, the INS initiated deportation proceedings against him, in which the agency charged that he was deportable because of a 1989 drug conviction. Mejia conceded that he was deportable, but he applied for a waiver pursuant to § 212(c) of the Immigration

and Nationality Act of 1952 (codified as amended at 8 U.S.C. § 1182(c)). That section makes an alien whose drug conviction renders him deportable eligible for discretionary relief from deportation. *See Francis v. INS*, 532 F.2d 268, 270–73 (2d Cir.1976). On March 22, 1993, an immigration judge declined to grant § 212(c) relief and ordered Mejia deported to the Dominican Republic. On April 6, 1993, Mejia filed a timely appeal to the BIA.

About a year after filing his appeal, Mejia voluntarily left this country for the Dominican Republic on April 27, 1994. When he returned on May 24, 1994, he was stopped at the border and became subject to exclusion proceedings,[2] in part because he had left the country after the immigration judge's order had issued. The INS claimed, among other things, that Mejia withdrew his BIA appeal by departing the United States, that in so doing Mejia deported himself, and that because he was deported, he became excludable. Mejia was detained in an INS facility in New York.

Reviewing the March 22, 1993 decision of the immigration judge denying Mejia discretionary relief under § 212(c) and ordering Mejia deported, the BIA held on August 26, 1994 that the decision had become final by virtue of Mejia's departure. That meant that the BIA would not review the immigration judge's decision; Mejia was considered to have executed the final order by leaving, and thereby to have deported himself. On September 16, 1994, Mejia filed in this court a petition for review of the BIA's decision in the deportation proceeding.[3]

In the meantime, the *exclusion* proceedings continued. An immigration judge on August 18, 1994, found Mejia excludable. On

---

1. "Exclusion proceedings" determine whether an alien seeking entry will be "allowed to enter or shall be excluded and deported." 8 U.S.C. § 1226(a). "Deportation proceedings" are concerned with aliens who have already entered the United States and may be subject to removal or "expulsion." 8 U.S.C. § 1251. *See Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). The laws governing exclusion are codified at 8 U.S.C. §§ 1221–1230. The laws governing deportation are codified at 8 U.S.C. §§ 1251–1260.

2. *See supra* note 1.

3. On September 16, 1994 the petitioner also requested an emergency stay of deportation, but he withdrew the request upon receiving assurance from the Government that he would not be deported while his exclusion proceedings were still pending before the BIA.

January 11, 1995, the BIA affirmed that decision.

Some of the facts from that point are in dispute. According to the version of events presented by Michael DiRaimondo, the petitioner's counsel, DiRaimondo received the BIA's January 11 decision on January 13, 1995, the Friday before the holiday weekend commemorating the birthday of Dr. Martin Luther King, Jr. DiRaimondo contacted James O'Brien, Special Assistant U.S. Attorney and a lawyer for the Government in this case, on the following Tuesday, January 17, 1995, and asked the Government to "maintain the status quo" pending oral argument in the deportation case, or at least until the court acted on a motion for an emergency stay. (Presumably "maintain[ing] the status quo" meant ensuring that Mejia would not be sent back to the Dominican Republic.) O'Brien supposedly refused to take steps to "maintain the status quo" but allegedly told DiRaimondo that it would be at least two-to-three weeks before the INS returned Mejia to the Dominican Republic because bureaucratic processing would take that long anyway. O'Brien did consent to an expedited appeal in the deportation proceeding, so that the case might be heard before the INS returned Mejia.

On Thursday, January 19, 1995, DiRaimondo called the Administrative Attorney's office of this court and informed a staff lawyer that he intended to file that day an emergency motion for a stay of deportation.[4] The administrative attorney urged DiRaimondo to seek the Government's agreement to maintain the status quo. Although O'Brien again declined to agree, he did reassure DiRaimondo of the two-to-three-week wait, according to DiRaimondo.

DiRaimondo filed the motion that day, Thursday, January 19, 1995, and on Friday he pressed the staff attorney to have a judge address the motion immediately, as Mejia could have been sent from the United States at any time.

According to Mejia's counsel, at 3:00 a.m. on Monday, January 23, 1995, Mejia was awakened at his place of detention and told that he was being returned to the Dominican Republic; he was not permitted to call his wife until 6:30 a.m., and his plane left at 7:00 a.m. Mejia's counsel reports that his client had no clothes, belongings or money, and that he had no time to make arrangements for his arrival in the Dominican Republic. Two hours later, at 9:00 a.m., Mejia's motion for an emergency stay was granted, the signing judge then unaware that the INS had already sent Mejia from the country and that the motion was thereby possibly rendered moot. Later that morning, O'Brien told DiRaimondo that he had informed the INS that no stay was in effect and that the agency could return the petitioner to the Dominican Republic. Oral argument on the August 26, 1994, BIA decision in the deportation proceeding went forward on an expedited basis on February 9, 1995. In motion papers filed immediately before that hearing, the petitioner's counsel asked that this court order his client's return to the United States.

The Government, in declarations by O'Brien, offers a somewhat different explanation of events following the BIA's January 11, 1995 decision in the exclusion proceeding. O'Brien denies ever having provided any assurance of a two-to-three-week window before Mejia's return. O'Brien contends fur-

---

4. The Government takes issue with DiRaimondo's use of the term "stay of deportation," since, in its view, Mejia had already been deported at the time of the motion and the motion followed the exclusion proceedings. The Government contends further that under 8 U.S.C. § 1105a(b), only the district court, not this court, could have had jurisdiction over any such motion, as the motion would have been for a stay of the exclusion order. Section 1105a(b) provides: "[A]ny alien against whom a final order of exclusion has been made ... may obtain judicial review of such order by habeas corpus proceedings and not otherwise."

We need not address these contentions to resolve this case. However, we note that while the word "deport" appears in the statutory provisions concerning exclusion proceedings, it is not used there as a "word of art" as it is in the provisions addressed to deportation proceedings. *Leng May Ma*, 357 U.S. at 187, 78 S.Ct. at 1073. Since the distinctions between the deportation and exclusion proceedings are important and potentially confusing in this case, we will avoid the terms "deport" or "deportation" when referring to the INS's January 23 return of Mejia to the Dominican Republic.

ther that under 8 U.S.C. § 1227(a)(1) the Government lacked the statutory authority to "maintain the status quo."[5] O'Brien acknowledges that he knew on Friday, January 20, of the INS's plans to return the petitioner on Monday morning. He informed the agency of the pending emergency motion and he told the INS he would inform them if the motion was signed before the scheduled flight.

O'Brien explains his failure to inform DiRaimondo of the departure date on grounds that the INS, for security reasons, maintains a policy of not disclosing the time of an alien's return to the alien's counsel. And he notes that DiRaimondo had already informed the court that return of Mejia was "imminent." While he acknowledges having known as early as Thursday, January 19, 1995 that the INS was then arranging for Mejia's return, O'Brien does not explain why the Government did not inform either the court or its staff attorneys—actively involved in the handling of a pending motion to prevent Mejia's forced return to the Dominican Republic—of the INS's intentions. Finally, O'Brien points out that the petitioner never exercised his statutory right to seek relief in a district court habeas corpus proceeding, pursuant to 8 U.S.C. § 1105a(b).

## DISCUSSION

### A.

█ The threshold question we address is our jurisdiction to review the BIA's August 26, 1994, decision in the deportation proceeding. There appear to be two possible bases on which we could conclude that we lack jurisdiction. Both bases rest, at least in part, on 8 U.S.C. § 1105a(c) (1988), which provides in pertinent part:

An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order.

One possible ground on which we would lack jurisdiction is the petitioner's departure on January 23, 1995. Arguably, since Mejia departed on January 23, 1995—after the issuance of the August 26, 1994, order—the provision could leave us without jurisdiction to review the August order. This court recently held that § 1105a(c) "constitutes a clear jurisdictional bar, and admits of no exceptions." *Roldan v. Racette*, 984 F.2d 85, 90 (2d Cir.1993). At oral argument, counsel for the petitioner expressed concern that this court's strict reading of this provision would deprive this court of jurisdiction in the present matter, despite the questionable circumstances of the petitioner's involuntary return. Petitioner's counsel urged this court to consider a possible exception to this jurisdictional rule recently mentioned by the First Circuit in *Baez v. INS*, 41 F.3d 19, 25 (1st Cir.1994). The *Baez* court, while agreeing with *Roldan*'s strict interpretation and calling § 1105a(c)'s jurisdictional bar "absolute," nevertheless suggested that a court might maintain jurisdiction in the exceptional case of "knowingly unlawful deportation by the INS for the specific purpose of shortstopping an alien's right to review." *Baez*, 41 F.3d at 25.

Perhaps concerned that if this court were to adopt such an exception it would apply here, the Government at oral argument contended that the INS's January 23 return of Mejia following the BIA's exclusion order was "irrelevant" to this case—an appeal of the original deportation proceeding. According to the Government, by January 23 jurisdiction had long been lost because the petitioner had departed voluntarily in April 1994, while his initial appeal to the BIA in the deportation case was pending.

We need not consider whether the proposed exception in *Baez* would square with this court's holding in *Roldan*, and whether the exception would apply here, because we agree with the Government that we lost jurisdiction based on Mejia's voluntary departure in 1994. For reasons described below,

**5.** Section 1227(a)(1) provides in pertinent part: "Any alien ... arriving in the United States who is excluded under this chapter, *shall* be immediately deported, in accommodations of the same class in which he arrived, unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper." (Emphasis added.)

however, our decision should not be read as condoning forced departures by the agency as a technique to avoid judicial review of its actions.

### B.

The petitioner's primary legal contention is that 8 C.F.R. § 3.4 is invalid, and that therefore the petitioner did not "deport himself" by traveling to the Dominican Republic in April 1994 while his appeal to the BIA was pending. The petitioner argues in the alternative that because his trip was "brief, casual and innocent" it did not effect a departure under the holding set forth in *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). The Government contends that § 3.4 is valid, and that therefore the petitioner deported himself and left this court without jurisdiction to hear his appeal. It argues that the *Fleuti* exception does not apply here.

■ We first consider whether § 3.4 is valid. Section 3.4, which falls under a subpart of the Code of Federal Regulations entitled "Board of Immigration Appeals," provides in pertinent part:

> Departure from the United States of a person who is the subject to [sic] deportation proceedings subsequent to the taking of an appeal but prior to a decision thereon shall constitute a withdrawal of the appeal, and the initial decision in the case shall be final to the same extent as though no appeal had been taken.

The petitioner does not claim that this rule, adopted in 1964, is substantively illegitimate. Rather, he argues that it is invalid because it was promulgated without notice and comment procedures that he claims are required by the APA. The APA's notice and comment requirement applies to legislative rules, but it does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Our question, then, is whether § 3.4 is an interpretive rule.

In deciding whether a rule is interpretive or legislative, the "central question is essentially whether an agency is exercising its rule-making power to clarify an existing stat-ute or regulation, or to create new law, rights, or duties." *White v. Shalala*, 7 F.3d 296, 303 (2d Cir.1993) (citing Kenneth C. Davis, Administrative Law Treatise § 7.10, at 54 (2d ed. 1979)). We find that § 3.4 clarifies existing law, and therefore that it is interpretive.

To evaluate this provision, it will be helpful to review the administrative process of deportation. First, an immigration judge may issue a decision ordering an alien deported. *See* 8 C.F.R. § 242.8 (1994). The immigration judge's decision may then be appealed to the BIA. 8 C.F.R. §§ 3.38, 242.21 (1994). If an immigration judge's order of deportation is not timely appealed to the BIA, or if appeal is waived, the order becomes final and it may be "executed," that is, the INS may deport the alien. 8 C.F.R. §§ 243.3 (1994); *see also* 8 C.F.R. §§ 3.1(b), 3.38, 3.39, 243.1. If an appeal is taken, and the Board approves the order, it then becomes final and may be executed. 8 C.F.R. §§ 243.1, 243.3 (1994). A final order of the BIA is appealable to the courts of appeals. 8 U.S.C. § 1105a(a).

Section 3.4 addresses the situation where an immigration judge issues a deportation order, the alien appeals to the BIA, and the alien then leaves the country. Under § 3.4, the appeal is deemed withdrawn and the initial decision becomes final as if there had been no appeal to the BIA.

To determine whether § 3.4 is legislative or interpretive, we review two statutory provisions: 8 U.S.C. § 1101(g) (section 101(g) of the Immigration and Nationality Act), and 8 U.S.C. § 1105a(c) (section 106(c) of the Act). Section 1101(g) provides that "any alien ordered deported ... who has left the United States, shall be considered to have been deported in pursuance of law." Section 1105a(c) provides:

> An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order.

The petitioner argues that these statutory provisions have properly been interpreted to concern only final orders. That is, under these provisions, an alien who departs after a final order executes his own deportation and divests this court of jurisdiction. By extending that principle to orders of immigration judges that have yet to be addressed on appeal to the BIA, the petitioner contends, the agency rule creates new rights and duties and therefore is legislative. We disagree.

We begin our analysis with § 1105a(a), which vests in the courts of appeals jurisdiction to review "final orders of deportation." [6] 8 U.S.C. § 1105a(a). Section 1105a(c) describes circumstances under which an alien loses the right to judicial review that § 1105a(a) would otherwise afford. Under § 1105a(c), loss of jurisdiction occurs when an alien has failed to exhaust administrative remedies, or when he has departed after issuance of an order. *See* 8 U.S.C. § 1105a(c). An immigration judge's order, for example, can become a final agency order when an alien fails to appeal to the BIA or waives his right to appeal to the BIA. *See* 8 C.F.R. § 243.1 (1994). However, under § 1105a(c), a court of appeals would lack jurisdiction to review that final order, because the alien had failed to exhaust available administrative remedies. *See, e.g., Joo v. INS,* 813 F.2d 211, 212 (9th Cir.1987) (per curiam) ("A waiver of the right to appeal is a failure to exhaust administrative remedies."). Similarly, if an alien departs this country after the issuance of a final order that would otherwise be subject to judicial review, this court loses jurisdiction. *See, e.g., Hajnal v. INS,* 980 F.2d 1247, 1247–48 (per curiam) (9th Cir.1992) (finding no jurisdiction where alien departed after BIA affirmance of deportation order).

Whereas § 1105a(c) clearly concerns only final orders, § 1101(g) does not indicate whether an alien effectuates his deportation by leaving the country after the issuance of an order that has not become final at the time of his departure.[7] Section 3.4 clarifies that question. By stating that if a person departs after an immigration judge's order it is as if no appeal has been taken, the provision makes clear that § 1101(g) applies to orders of immigration judges. As it clarifies ambiguity, § 3.4 is interpretive. This is not to say that an agency's rules regarding the finality of its own orders are invariably or necessarily interpretive. But in this case, where the language and purpose of § 3.4 so closely track the relevant statutory provisions as to make the rule virtually self-evident, we conclude that § 3.4 creates no new rights or duties. Rather, it provides a reasonable and predictable interpretation of the rights and duties delimited in the statute, which appropriately has been said to provide "ample congressional warrant" for the rule. *See Aleman–Fiero v. INS,* 481 F.2d 601, 602 (5th Cir.1973) (per curiam). Unlike a legislative rule, § 3.4 does not have " 'effect[s] *completely independent* of the statute.' " *United Technologies Corp. v. United States E.P.A.,* 821 F.2d 714 (D.C.Cir.1987) (quoting *Cabais v. Egger,* 690 F.2d 234, 238 n. 9 (D.C.Cir. 1982) (emphasis in *Cabais* )). Rather, § 3.4 functions as an "interpretation of a statute rather than an extra-statutory imposition of rights, duties or obligations." *White v. Shalala,* 7 F.3d at 304. Therefore, it is an interpretive rule.

■ To refute this conclusion, the petitioner points out that the Department of Justice in June 1994 published a proposed rule for notice and comment that concerned motion and appeal practice in immigration proceedings. 59 Fed.Reg. 29,386, 29,389 (proposed

6. The statute specifically provides that the procedures prescribed by Chapter 158 of Title 28 of the U.S.Code govern deportation orders. That chapter gives the courts of appeals the exclusive jurisdiction to review final orders of various agencies. *See* 28 U.S.C. § 2341–2353.

7. Legislative history indicates that a purpose of the provision was "to make clear that an alien who had been ordered deported, and who then departed the United States at his own expense,

as opposed to the expense of the government, had in fact been deported." *Mendez v. INS,* 563 F.2d 956, 959 (9th Cir.1977) (citing *Mrvica v. Esperdy,* 376 U.S. 560, 84 S.Ct. 833, 11 L.Ed.2d 911 (1964)). Because the Government does not incur the expense of deportation until an alien is finally ordered deported, the provision presumably addresses final orders, although the question of finality does not appear to have been a direct or explicit concern of Congress.

June 7, 1994).[8] An agency's characterization of a rule is the "'starting point'" for an analysis of its status as legislative or interpretive. *See Metropolitan Sch. Dist. v. Davila,* 969 F.2d 485, 489 (7th Cir.1992) (quoting *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993). In this case, however, this inquiry supports the view that the rule is interpretive.

First, when § 3.4 was promulgated in 1964, the Attorney General deemed it a "technical" rule that did not warrant notice and comment. 29 Fed.Reg. 2692 (Feb. 19, 1964). Second, the recently proposed repromulgation applies not only to § 3.4, but to more than ten other provisions of the Code of Federal Regulations. Moreover, the particular portion of § 3.4 at issue in this case would not be amended by the proposed rule. Against this background, we afford more weight to the agency's 1964 description, which was presented contemporaneously with the original promulgation and which was directed to this specific provision. Finally, while notice and comment are required for legislative rules, they are by no means prohibited for interpretive rules. *See* 2 Davis, *supra,* § 7.18, at 88. For all of these reasons, we do not find the fact that § 3.4 is currently the subject of notice and comment rulemaking to undermine the view that the rule is interpretive.

### C.

Having concluded that § 3.4 is a valid interpretive rule for which notice and comment procedures were not required, we now must decide whether we have jurisdiction over this petition. We must also decide whether any loss of jurisdiction would be overcome by the petitioner's argument that his April 1994 trip to the Dominican Republic was brief, casual and innocent.

Our first inquiry is the effect of Mejia's departure on our subject matter jurisdiction. Under § 3.4, Mejia's departure was the equivalent of his having failed to appeal.

Since Mejia did not exhaust his administrative remedies, as § 1105a(c) requires before judicial review is available, we lack jurisdiction.

The Supreme Court's decision in *Rosenberg v. Fleuti* does not alter this result. That case concerned whether an alien's permanent residence was interrupted by his wholly lawful and brief departure so as to make his return an "entry" for purposes of exclusion proceedings. *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812. *Fleuti* does not apply in a case like this one, where the petitioner departed after a deportation order had already issued. *See Aleman–Fiero,* 481 F.2d at 602.

### D.

Our conclusion that we lack jurisdiction based on § 3.4 makes it unnecessary for us to consider whether the INS's return of Mejia to the Dominican Republic on January 23, 1995, alone would have left us without jurisdiction. We nevertheless find the Government's conduct sufficiently troubling to warrant comment. We would harbor concern even if we disregarded DiRaimondo's version of events and assumed the Government's version as true.

The Government's lawyers claim that the INS had no duty to wait to return Mejia simply because a motion for stay was pending, and that the Government "could not" maintain the status quo under 8 U.S.C. § 1227(a)(1). We recognize that § 1227(a) has been construed by at least one court to limit greatly the ability of the Attorney General and her designated agents to exercise discretion to delay return of an alien finally ordered excluded. *See Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216–17 & n. 12 (11th Cir.1985) (holding that INS district director may exercise discretion not to deport excluded alien only if deportation logistically or economically impracticable, or if alien's testimony necessary for criminal prosecutions). Without adopting or rejecting that interpretation of § 1227(a), we suggest that even such a strict view would not justify any

8. As of the date of this opinion, the proposed rule    had not been adopted.

# 366

intentional subversion of this court's authority.

When Mejia was returned, the Government and its counsel were well aware that both the petitioner's counsel and this court's administrative attorneys were earnestly attempting to place the motion for a stay before a judge of this court. As stated above, in this particular case, because of its unusual procedural and jurisdictional posture, we need not decide whether the agency pursued "knowingly unlawful deportation ... for the specific purpose of shortstopping an alien's right to review," *Baez,* 41 F.3d at 25, or whether such behavior could effectively defeat our jurisdiction. However, neither the INS nor its counsel should labor under any misapprehension that this decision condones any such conduct.

## CONCLUSION

By way of summary:

1. 8 C.F.R. § 3.4 is an interpretive rule, valid in the absence of notice and comment rulemaking.

2. Because Mejia departed this country during the pendency of his appeal to the BIA, he essentially withdrew that appeal, pursuant to § 3.4.

3. Since Mejia did not exhaust his administrative remedies, we lack subject matter jurisdiction and must dismiss the petition for review.

4. Because we lack subject matter jurisdiction under the circumstances presented here, we deny the petitioner's motion for an order to be returned to the United States.